**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES TIMOTHY JOHNSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | 2:13-cv-0071 |
| | ) | Electronic Filing |
| **CAROLYN W. COLVIN,**[1] | ) | Judge David S. Cercone |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

### I.   INTRODUCTION

Charles Timothy Johnson  ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of the Commissioner of Social Security ("defendant") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act").  42 U.S.C. §§ 401-433, 1381-1382f.  The record has been developed at the administrative level.  The matter is before the court on cross-motions for summary judgment.  (Docket Nos. 12, 14).  For the reasons that follow, plaintiff's motion [12] will be denied and defendant's motion [14] will be granted.

### II.   PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on June 8, 2009, alleging that he had been disabled since October 17, 2007 due to prostate cancer, low back pain and depression.  R. at 82, 179-180,

---

[1]      Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue.  Social Security History-Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (as visited on August 13, 2013).  Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); Fed. R. Civ. P. 25(d).

183-189.  Both claims were denied on December 3, 2009.  R. at 97.  On December 10, 2009, plaintiff requested a hearing.  R. at 97, 99-108.  On May 24, 2011, a hearing was held before Administrative Law Judge ("ALJ") Brian Wood.  R. at 31.  The ALJ denied plaintiff's application for benefits on July 27, 2011.  R. at 12-24.  Plaintiff's request for review by the Appeals Council was denied on November 30, 2012.  R. at 1-5.  The instant action followed.

## III.  STATEMENT OF THE CASE

### a.  General background

Plaintiff was born on July 24, 1961, making him 46 years of age at the time of his alleged onset date and 49[2] years of age at the time of the hearing.  R. at 12, 22, 34.  Plaintiff served as a mechanic in the Army Reserve from June 1979 to June 1982.  R. at 225.  He had additional work experience as a concrete tester, a concrete pump supervisor, a newspaper stacker, a truck driver and an industrial cleaner but has not been employed since 2006.  R. at 35-37, 225-232.  Plaintiff was incarcerated from 2006 to 2009 for distribution of narcotics and upon release was sent to a half-way house.  R. at 38-39, 464.  He has a common-law wife who was employed at the time of the hearing.  R. at 34-35.  His source of income has been public assistance.  R. at 34.  Plaintiff completed high school.  R. at 35.

A typical day for plaintiff consists of talking to his mother on the telephone, watching television, and occasional cleaning.  R. at 47-48, 52, 465.  At the time of the hearing plaintiff asserted that he could do little with regard to household chores, but he was able to prepare some types of food and wash his own dishes.  R. at 49.  Plaintiff attended church, but not every Sunday.  R. at 50.  He described himself as less tolerant than he used to be but still a "very friendly guy."  R. at 51.

---

[2]      The SSA's regulations define "younger person" as a person who is less than 50 years of age.  20 C.F.R. §§ 404.1563, 416.963.

### b. Mental treatment history

Plaintiff has a history of substance abuse and psychiatric treatment. R. at 1274. He reported that he attempted suicide in the 1980's. *Id.* Over the course of several years plaintiff periodically was treated for mental health issues at the Butler Pennsylvania Veterans Affairs hospital ("Butler VA"), where he received the following diagnoses: depression, chronic anxiety, substance addiction, and obsessive compulsive versus personality disorder. R. at 642, 1147-1148, 1259-1262, 1270.

On August 22, 2003, plaintiff screened negative for depression at Butler VA. R. at 895-896. An alcohol screening was also administered, with plaintiff scoring a three.[3] R. at 896. Plaintiff also was treated for cocaine dependency at this time. *Id.* Depression and alcohol screenings were both negative on January 8, 2004, and plaintiff stated that he had not had any alcohol in the past year. R. at 898-899. On January 28, 2004, plaintiff's depression and alcohol screenings remained negative. R. at 927.

Records indicate that plaintiff was suffering from depression on May 18, 2004. R. at 892. On February 8, 2006, plaintiff's depression screen was negative again but his alcohol screen was positive. R. at 931. Plaintiff telephoned Butler VA on November 13, 2006, asking to be admitted because his "mind [wasn't] acting right." R. at 991. Plaintiff denied that he was suicidal. *Id.* On March 16, 2009, plaintiff's depression and alcohol screens were negative. R. at 935, 983-987.

After his release from incarceration, plaintiff suffered from depression and chronic anxiety related to his cancer diagnosis. R. at 1149, 1151, 1169. On March 12, and June 17,

---

[3]      The CAGE alcohol screening test is used to identify lifetime problems with alcohol. A score of two or higher constitutes a positive test and indicates the need for further assessment. National Institute on Alcohol Abuse and Alcoholism, Screening tests, *available at* http://pubs.niaaa.nih.gov/publications/arh28-2/78-79.htm (last visited January 9, 2014).

2010, plaintiff screened positive for moderate depression; his alcohol tests remained negative.  R. at 1149, 1169-1170.  Notes from those visits indicate he was alert, well groomed, coherent and did not suffer from psychotic symptoms or suicidal ideation.  R. at 1149, 1171.

On March 18, 2011, plaintiff reported that he was suffering from increased anxiety as well as obsessing over cleaning and rechecking things in his home.  R. at 1259-1260.  His alcohol screen remained negative and his depressive disorder was in remission.  R. at 1261-1262.  Plaintiff was diagnosed with obsessive compulsive disorder versus personality disorder.  R. at 1261.

T. David Newman, Ph.D., completed a consultative psychological evaluation of plaintiff on October 6, 2009.  R. at 464.  According to Dr. Newman's report, plaintiff walked one half mile to attend the appointment.  *Id.*  Dr. Newman found plaintiff to be a reasonably reliable informant.  *Id.*  Plaintiff stated that he was disabled from work due to back pain, cancer and depression.  R. at 464.  Nevertheless, he was able to do chores, go to the store and watch television.  R. at 465.  Dr. Newman found that Plaintiff: was not anxious, made a good degree of eye contact, spoke clearly, had no difficulty establishing a working rapport, had no history of perceptual disturbances, and was oriented in all spheres.  *Id.*  Plaintiff was diagnosed with crack cocaine dependence (in a controlled environment due to his parole from prison) and adjustment disorder with depressed mood.  R. at 466.  Dr. Newman concluded that plaintiff's abilities to understand, remember, and carry out instructions were not limited by his impairments.  R. at 466-467.  His abilities to respond appropriately to supervisors, co-workers, and work pressures were not limited either.  R. at 466-467.

Grant W. Croyle, Ph.D., performed a consultative evaluation of plaintiff's medical records and thereafter completed an assessment of his mental residual functional capacity

("RFC") on October 9, 2010. R. at 469-472. Dr. Croyle found that the medical evidence established that plaintiff suffered from depressive disorder versus adjustment disorder with depressed mood and a history of cocaine dependence. R. at 471. He further found plaintiff's statements to be partially credible. *Id.* He assessed moderate limitations in plaintiff's abilities to perform activities within a schedule, maintain regular attendance, be punctual with customary tolerances, and respond appropriately to changes in the work setting. R at 469-470. Dr. Croyle opined that Dr. Newman's finding of no limitations in these areas was inconsistent with the record evidence. *Id.* Accordingly, Dr. Croyle granted only partial weight to the opinion of Dr. Newman. *Id.* He nevertheless concluded that plaintiff was able to meet the basic mental demands required for competitive work on a sustained basis despite the aforementioned limitations. *Id.*

### c. Physical treatment history

Plaintiff was diagnosed with prostate cancer on November 5, 2007 while incarcerated. R. at 319-320, 502-503. At the time of diagnosis his prostate specific antigen ("PSA") level was 6.7.[4] R. at 293. On June 26, 2008, plaintiff completed a course of radiation therapy, after which his PSA level dropped to 3.6. *Id.* In 2009, plaintiff's PSA number was elevated and he was treated with implanted radiation seeds[5] and Zoladex.[6] R. at 41, 500, 1100, 1243. By March 1,

---

[4] "The PSA test is used primarily to screen for prostate cancer. A PSA test measures the amount of prostate specific antigen (PSA) in your blood. PSA is a protein produced in the prostate, a small gland that sits below a man's bladder." Mayo Clinic, PSA, http://www.mayoclinic.com/health/psa-test/MY00180 (last visited Jan. 3, 2014).

[5] "Prostate brachytherapy is a form of radiation therapy used to treat prostate cancer. Prostate brachytherapy involves placing devices containing radiation in the prostate gland, close to cancer cells." Mayo Clinic, Prostate brachytherapy, *available at* http://www.mayoclinic.org/tests-procedures/prostate-brachytherapy/basics/definition/PRC-20014309 (last visited Jan. 3, 2014).

[6] "Zoladex" is a hormone used to treat cancer of the prostate. Mayo Clinic, Goserelin/Zoladex, *available at* http://www.mayoclinic.org/drugs-supplements/goserelin-subcutaneous-route/description/DRG-20067310 (last visited Jan. 3, 2014).

2010, plaintiff's PSA level had decreased to 0.5.  R. at 1100.  Bone scans conducted on August 3, 2009 and February 18, 2011 did not reveal any metastasis.  R. at 1103, 1235-1236.  Plaintiff asserted at the hearing that his prostate cancer was no longer in remission.  R. at 42.  His counsel clarified, however, that the medical records did not actually indicate that Plaintiff's cancer had returned, only that his PSA levels were elevated and he was receiving further treatment.  R. at 42-43.

Plaintiff received treatment at the Butler VA on numerous occasions between August 22, 2003 and April 4, 2011.  R. at 522-1291.  Treatment notes from March 16, 2009 indicate that plaintiff suffered from mild degenerative changes in the lumbar spine but that his vertebral body heights and disc spaces were normal.  R. at 445, 523.  Although osteophytes[7] were present in Plaintiff's middle and lower spine, only mild degenerative changes were observed.  *Id.*  A Braden Scale[8] was completed during that visit and plaintiff was assessed with ratings of "walks frequently" and "no limitation" in the respective categories of activity[9] and mobility.[10]  R. at 595.  A bone scan conducted on August 3, 2009, again revealed only mild degenerative changes.  R. at

---

[7]	"Also called osteophytes, bone spurs often form where bones meet each other—in your joints.  Bone spurs can also form on the bones of your spine.  The main cause of bone spurs is the wear-and-tear damage associated with osteoarthritis.  Most bone spurs cause no symptoms and may undetected for years."  Mayo Clinic, Osteophytes, *available at* http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/CON-20024478 (last visited Jan. 3, 2014).

[8]	The Braden Scale measures the likelihood that a patient will develop a pressure ulcer.  U.S. National Library of Medicine, *2012AB Braden Scale Source Information,* http://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/LNC_BRADEN/ (last visited December 16, 2013).

[9]	A 4/4 in the category of "activity" means that the patient "walks frequently," and is able to walk "outside [the] room at least twice a day and inside [the] room at least once every two hours during waking hours."  Prevention Plus: the Home of the Braden Scale, Braden Scale for Predicting Sore Risk, http://www.bradenscale.com/images/bradenscale.pdf (last visited December 16, 2013).

[10]	A 4/4 in the category of "mobility" means that patient has "no limitation" in the ability to "make major and frequent changes in position without assistance."  *Id.*

1235-1236.

Plaintiff complained on April 21, 2010, that "[a]ll my bones hurt. Both legs hurt. I can hardly do stairs." R. at 1154. He noted that physical activity exacerbated his pain but that he was satisfied with his pain management. R. at 1156. On November 16, 2010, plaintiff appeared at the Butler VA for a checkup and again complained of back pain but stated that he did not have any new medical issues and he was content with his prescribed pain management. R. at 1286. Records from Butler VA also indicate that plaintiff was obese, with a body mass index ("BMI") of 36; he also had been diagnosed with Stage III chronic kidney disease. R. at 15, 1211, 1287.

Plaintiff began physical therapy for back and neck pain at Butler VA on February 2, 2010. R. at 1184-1185. Fifteen sessions were scheduled, eleven of which plaintiff attended. R. at 1162-1182. During plaintiff's second visit on February 4, 2010, he reported that his neck and back pain had improved. R. at 1184. Two weeks passed before plaintiff returned to physical therapy on February 18, 2010. *Id.* He reported increased back pain but attributed it to missing past sessions. *Id.* Over the course of the following sessions, from February 23 to March 9, 2010, plaintiff consistently reported that physical therapy had relieved some of his pain. R. at 1174-1178. On March 11, 2010, plaintiff stated that his back and neck had begun to feel "better overall" as a result of physical therapy. R. at 1173. Further improvement was reported to his therapists on March 18, 2010. R. at 1166.

During the physical therapy sessions in March of 2010, plaintiff reported that his back pain was improving but he was still experiencing intermittent pain. R. at 1162, 1165. Treatment notes from these sessions consistently indicated plaintiff tolerated the therapy well. 1162-1184.

At the Butler VA on April 21, 2010, plaintiff told Daniel Tolciu, D.O., that the physical therapy and pain medication regimen had been effective in controlling his pain. R. at 1153.

Plaintiff, however, elected to discontinue physical therapy on April 23, 2010. R. at 1163.

Plaintiff received a consultative physical examination from Ira E. Baumgartel, M.D., on November 13, 2009. R. at 487. Dr. Baumgartel observed the following: no edema, good peripheral pulses, deep tendon reflexes were physiologic, no sensory changes, tight lumbosacral muscles bilaterally in the lower lumbosacral area, a grip strength of 5+/5+, normal range of motion in all joints including the upper and lower extremities, normal flexion and extension, and a normal gait. R. at 489. Dr. Baumgartel further noted that plaintiff was able to walk on his toes and heels without any difficulty and, although he complained of pain, was able to squat and rise from a squat. *Id.* Plaintiff was diagnosed with carcinoma of the prostate, depression and low back pain. *Id.* In his report on plaintiff's ability to perform work-related physical activities, Dr. Baumgartel assessed plaintiff with the following limitations: lifting no more than ten pounds occasionally, carrying no more than twenty pounds occasionally, no more than one hour of standing and walking in an eight hour day, and no more than two hours of sitting during an eight hour day. R. at 491. Dr. Baumgartel also opined that plaintiff was unable to: bend, kneel, stoop, crouch, balance or climb. R. at 492.

Nghia Van Tran, M.D., Ph.D., conducted a record review and completed a physical residual capacity assessment of plaintiff on November 23, 2009. R. at 495-501. Dr. Van Tran noted that plaintiff had been diagnosed with the impairments of lower back pain and prostate cancer. R. at 500. Plaintiff was able to walk on the tips of his toes and his heels with no difficulty. *Id.* He was able to squat and arise from a squatting position but complained of pain. *Id.* Dr. Van Tran further observed that there were no significant complaints of lower back pain in plaintiff's medical records. *Id.* Plaintiff was assessed with the following limitations: able to lift and/or carry up to twenty pounds occasionally, frequently able to lift and/or carry up to ten

pounds, able to stand and/or walk with normal breaks for approximately six hours in an eight hour day, and able to sit with normal breaks for a total of about six hours in an eight hour day. R. at 496.

Although the physical findings of Dr. Baumgartel and Dr. Van Tran were similar, Dr. Van Tran opined that the limitations reported by Dr. Baumgartel were not consistent with the record evidence. R. at 489, 500-501. Dr. Van Tran found plaintiff's statements of his condition to be only partially credible. R. at 501.

### d. Administrative hearing

A hearing was held on May 24, 2011, in Seven Fields, Pennsylvania, before the ALJ, Brian W. Wood. R. at 31. Plaintiff was present and was represented by counsel, Marie Anderson, Esq. R. at 31, 171. An impartial vocational expert, Frances Kinley, M.Ed.,[11] also appeared and offered testimony. R. at 31, 59. Plaintiff was two months shy of his fiftieth birthday at the time of the hearing. R. at 34. He was five feet and six inches tall and weighed 209 pounds. R. at 34. Plaintiff's only sources of income were public assistance and his common-law wife's wages. R. at 34-35.

Plaintiff previously served in the Army Reserve. R. at 38. He later worked as a supervisor in a concrete pump room, lifting between fifteen and thirty pounds. R. at 36. He thereafter worked as a newspaper and advertisement stacker and lifted between ten and fifteen pounds. R. at 37. Plaintiff left this position as a result of addiction. *Id.* Plaintiff also worked as a sanitation truck driver which required him to lift garbage cans of varying weight. *Id.* He also had experience as a residential program worker. *Id.* The last job plaintiff held was as an operator for an industrial cleaning company in 2006, where he lifted up to twenty pounds. R. at

---

[11]     Ms. Kinley completed her Masters of Education in Rehabilitation Counseling at Pennsylvania State University. R. at 139. She has been self employed as a vocational expert since 1994. *Id.*

35.  Plaintiff also left that position due to an addiction problem.  R. at 35-36.

Plaintiff was incarcerated from 2006 to 2009.  R. at 38.  He was released in February of 2009, at which time he went to a halfway house.  *Id.*  While at the halfway house plaintiff was excused from chores due to his health.  R. at 39.

Plaintiff was diagnosed with prostate cancer while incarcerated.  R. at 39-40.  He received radiation treatments and his cancer went into remission.  R. at 40.  His PSA was elevated after arriving at the halfway house.  R. at 41.  He was prescribed Zoladex, which brought his PSA back down.  *Id*.  Plaintiff thereafter was taken off Zoladex, and his PSA levels rose again.  *Id.*  Zoladex was prescribed again and he was still taking it at the time of the hearing.  *Id.*  Plaintiff testified that his physicians informed him that his cancer was no longer in remission but they did not know where it was in his body.  R. at 42.  Plaintiff's counsel clarified that the medical records did not affirmatively indicate that the cancer had returned, only that he again was receiving radiation therapy and his PSA levels were elevated.  *Id.*

The ALJ asked plaintiff about how the cancer affected his daily living.  R. at 43.  Plaintiff reported that his cancer treatments caused him fatigue and pain in his bones.  R. at 44.  He further stated that he recently had been diagnosed with diabetes and now attributed much of his past fatigue to that condition.  R. at 43-44.  The pain in his bones comes and goes depending on the temperature.  R. at 45.  Plaintiff affirmed that he suffers from pain in his neck and lower back for which he had been prescribed Vicodin and a heating pad.  *Id.*  His pain is exacerbated by sitting or standing too long, the weather, or trying to lift weight.  R. at 46.  He is able to lift only ten to fifteen pounds, sit for fifteen to twenty minutes, and stand for only ten minutes.  R. at 46.  Plaintiff stated that he was being treated for depression by a therapist and a psychiatrist.  R. at

47. He takes an anti-depressant daily as well as Risperdal[12] to control his anger and anxiety but asserted that this medication was not working. *Id.* Plaintiff acknowledged a history of alcohol and cocaine abuse but testified that he has not used either since 2006. *Id.*

A typical day for plaintiff consists of a phone call to his mother and occasional compulsive cleaning. R. at 48. Plaintiff really likes cleaning and got "into it," but is often too fatigued to do it because of his diabetes. *Id.* The ALJ questioned plaintiff about notes in the record indicating that he moved furniture around to clean and plaintiff answered that it was something he learned in the military but no longer did. R. at 49. Plaintiff's wife prepares the household meals but he is able to feed himself when she is not able to cook. *Id.* He is able to wash his own dishes. *Id.* His wife does the grocery shopping but he accompanies her on occasion depending on his pain and fatigue. R. at 50.

Plaintiff's social activities consist of attending church two to three times per month but typically not going to restaurants or visiting with family or friends. R. at 50. Plaintiff reported that he got along with the people at church but was less tolerant than he used to be. R. at 51. He is able to stand and sit in church. *Id.* Plaintiff watches television but does not read books or magazines. R. at 52. He has a computer which he uses to play games, search the internet and access email. *Id.*

Plaintiff's counsel then conducted an examination of Plaintiff. *Id.* Plaintiff testified that his pain medication makes him drowsy and that he takes insulin. R. at 52-53. He alleged that he cannot walk for more than five minutes before he has to sit and rest. R. at 53. He can only sit for fifteen to twenty minutes. R. at 53. When playing games at his computer he has to get up

---

[12] "Risperdal" is used to treat the symptoms arising from psychotic disorders such as schizophrenia, mania or bi-polar disorder. Mayo Clinic, Risperidone/Risperdal, *available at* http://www.mayoclinic.org/drugs-supplements/risperidone-oral-route/description/DRG-20067189 (last visited Jan. 3, 2014).

and lie down or sit in his recliner due to back pain. R. at 54. He is not able to bend over to pick something off the ground but he can shower and care for his personal needs. *Id.* Although plaintiff has some difficulties with his memory, he attributes the deterioration to his age. *Id.* He reported difficulty in focusing while watching television and rarely finishing a show. R. at 55. He also suffers from daily anxiety attacks, which he describes as bursts of anger seemingly without provocation. *Id.* These attacks are accompanied by shaking and sweating. R. at 56. Plaintiff has to urinate every hour to an hour and a half, which causes him difficulty when trying to sleep. *Id.* In addition, he has cramps in his hands when typing or playing games on his computer. R. at 57. Finally, counsel asked plaintiff whether he suffered from all of these symptoms on a daily basis or if he ever had good days, to which plaintiff answered that he had both good days and bad days. R. at 58. He elaborated that he suffers from anxiety and depression two to three times a week, which stems from his cancer. *Id.*

The vocational expert, Ms. Kinley, summarized plaintiff's work history as follows: stacker position (light work, at the lower end of semi-skilled), truck driving (medium work, semi-skilled), pump room supervisor (medium work, skilled with regard to the casting of concrete and semi-skilled regarding personnel care), and press operator (medium work, at the lower end of semi-skilled). R. at 61. The ALJ then posited an individual that: required a sit stand option every thirty minutes, can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; cannot have concentrated exposure to extreme heat and cold, wetness, or humidity; is able to perform simple, routine, repetitive tasks; requires low-stress work, defined as occasional simple decision making and occasional changes in the work setting; cannot work in a fast-paced production environment; can have occasional interaction with coworkers and supervisors, no interaction with the public; and requires access to a

bathroom.  R. at 61-62.  Ms. Kinley concluded that such an individual would not be able to perform plaintiff's past work but would be able to perform the job of night patrol (light, unskilled), with 100,000 positions existing in the national economy.  R. at 62.  The individual also would be able to do work as an office helper, with 150,000 jobs in the national economy. *Id.*  Additionally, the individual could work as a hand packer or line worker (light, unskilled), with 80,000 jobs available in the national economy. R. at 62-63.

The ALJ then asked if work would be available if the exertion requirement in the aforementioned hypothetical was reduced to sedentary.  R. at 63.  Ms. Kinley replied that such an individual would be able to work as: a charge account clerk, with 45,000 jobs nationally; a ticket checker, with 50,000 jobs nationally; and a sub-assembler with 80,000 jobs nationally.  *Id.*  The ALJ inquired as to whether there would be work for such an individual if he or she was off task 20% of the time and she responded in the negative. *Id.*  As a follow-up, Ms. Kinley testified that such an individual cannot remain employed if he or she were to miss three or more days of work per month.  R. at 64.

## IV.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated

rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

## V. DISCUSSION

### a. The ALJ's decision

The ALJ found that plaintiff met the insured status requirements of the Act through March 31, 2011 and had not engaged in substantial gainful activity since his alleged onset date of August 1, 2007. R. at 14. At the time of plaintiff's alleged disability onset date, he was defined as a "younger person" under the regulations. 20 C.F.R. § 404.1563 and 416.963; R. at 22. At the time of the hearing, however, plaintiff's age category had changed to "closely approaching advanced age."[13] *Id.* Plaintiff has the following severe impairments: a history of prostate carcinoma; degenerative disc disease; obesity; depressive disorder; obsessive compulsive disorder versus personality disorder; and a history of alcohol and cocaine dependence. *Id.* Plaintiff's impairments did not singularly or in combination meet or medically equal one of the listed impairments at 20 C.F.R. Part 404, Subpart P, App'x 1. R. at 16. The ALJ further found that the record failed to establish that plaintiff suffered a recurrence of prostate cancer after the initial hormone therapy. R. at 16. In analyzing the "paragraph B" criteria, the ALJ determined that plaintiff's mental impairments caused no more than moderate limitations in activities of daily living, social functioning, or concentration, persistence, and pace. *Id.* The record also failed to establish the presence of "paragraph C" criteria. R. at 17.

Plaintiff's Residual Functional Capacity ("RFC") was assessed as follows:

[C]laimant has the residual functional capacity to perform light work as defined in

---

[13] The regulations classify an individual between the ages of fifty and fifty-four as a "person closely approaching advanced age." 20 C.F.R. § 404.1563 and 416.963.

20 CFR 404.1567(b) and 416.967(b) where he lifts and carries 20-pounds occasionally and 10 pounds frequently; where he can stand or walk for six-hours of an eight-hour workday; where he can sit for six-hours of an eight hour workday; where he requires a sit/stand option every 30-minutes; where he can never climb ladders, ropes, and scaffolds; where he can occasionally climb ramps and stairs and he can occasionally balance, stoop, kneel, crouch, and crawl; where he cannot have concentrated exposure to extreme heat and cold, wetness or humidity; where he is able to perform simple, routine, repetitive tasks; where he requires low-stress work (defined as occasional simple decision making and occasional changes in the work setting; where he cannot perform work in a fast-paced production environment; where he can have occasional interaction with coworkers and supervisors and no interaction with the public; and where he requires access to a bathroom.

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. R. at 19. Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, however, were found not credible to the extent they were inconsistent with the aforementioned RFC. The ALJ noted that no medical sources had opined that plaintiff was disabled from regular and continuous work as a result of his pain-related issues. *Id.* In formulating the RFC, the ALJ took into account obesity and kidney disease along with all of plaintiff's other alleged impairments. R. at 15. Further, the ALJ included the functional limitations which plaintiff attributed to diabetes. *Id.*

The opinions of Dr. Van Tran and Dr. Ira Baumgartel were given weight by the ALJ in reaching his decision. R. at 19. The portion of Dr. Baumgartel's opinion which concluded that plaintiff was limited to standing for one hour or less and sitting for no more than two hours was discounted. R. at 20. The ALJ found these limitations to be inconsistent with Dr. Baumgartel's own objective examination and the other medical evidence of record. *Id.*

The ALJ determined that plaintiff was unable to perform his past relevant work. R. at 22. Transferability of job skills was found to be immaterial because the medical-vocational rules supported a finding that plaintiff is not disabled regardless of whether he has transferable work

skills.[14]  *Id.*  Plaintiff has at least a high school education and is able to communicate in English. *Id.*  The ALJ concluded that in light of plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that he could perform. R. at 23.  Accordingly, the ALJ concluded that plaintiff had not been disabled under the Act from August 1, 2007, through the date of his decision.  *Id.*

On appeal, plaintiff argues that the ALJ erred in: (1) granting little weight to a portion of a consultative examiner's opinion, resulting in a RFC that was not supported by substantial evidence; (2) assessing plaintiff's credibility; and (3) submitting hypotheticals to the vocational expert that were not based on substantial evidence.  (Docket No. 13 at 13).  Defendant counters that the ALJ appropriately weighed the consultative examiner's opinion and that his decision was supported by substantial evidence.  (Docket No. 15 at 11).

**b.  Dr. Baumgartel's opinion and plaintiff's RFC**

Plaintiff specifically argues that the ALJ erred in giving too little weight to the limitations assessed by Dr. Baumgartel and as a result the ALJ's RFC did not contain all of plaintiff's credibly established limitations.  (Docket No. 13 at 8).  Further, the ALJ purportedly erred by not contacting Dr. Baumgartel for clarification of his opinion.  (Docket No. 13 at 9).  Defendant maintains that the ALJ's RFC was supported by substantial evidence and the ALJ was not required to contact Dr. Baumgartel for clarification.  (Docket No. 15 at 9, 11-12).

Plaintiff's contention that the ALJ was required to place more reliance on Dr. Baumgartel's assessment of his limitations lacks merit.  In reaching a disability determination, the ALJ "must consider the medical findings that support a treating physician's opinion that the claimant is disabled."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  It is within the ALJ's

---

[14]      Citing:  SSR 81-41 and 20 C.F.R. Part 404, Subpart P, App'x 2.

discretion to discredit a medical opinion which is inconsistent with or unsupported by the medical documentation. *Rimel v. Astrue*, 521 F. App'x 57, 59 (3d Cir. 2013). Among the factors to be analyzed in determining the weight to be given to a medical opinion are the supportability of the opinion and its consistency with the record as a whole. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2).

The ALJ noted that the limitations assessed by Dr. Baumgartel were not consistent with his own the objective examination of Plaintiff. R. at 20. The only information provided by Dr. Baumgartel to support his medical findings was the phrase "low back pain." R. at 491. Although Dr. Baumgartel opined that plaintiff was limited to standing for one hour or less and sitting no longer than two hours, he observed that plaintiff had a normal range of motion in all joints and his upper and lower extremities, as well as a normal gait. R. at 20, 489. Plaintiff also was able to walk on his toes and heels without difficulty. *Id.* Although his report noted that plaintiff suffered back pain when squatting, nothing else therein suggested that plaintiff suffered from limitations in sitting and standing. R. at 20, 487-489.

In addition to being inconsistent with his own documentation, the limitations assessed by Dr. Baumgartel also were inconsistent with the record as a whole. When determining the weight to give to medical opinions, an ALJ is entitled to weigh all of the evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In order for a medical opinion to be accorded substantial weight, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). Dr. Baumgartel's assessment is inconsistent with the findings of other examining physicians as well as plaintiff's own statements. Contrary to his testimony that he could walk for no more than five minutes without taking a rest, plaintiff

was able to walk unaccompanied for a half of a mile to attend his evaluation with Dr. Newman. R. at 53, 464. Further, plaintiff's complaints regarding the severity of his back pain are inconsistent with his reports that physical therapy and medication were effective in managing his pain. R. at 19, 1166-1184, 1286. Although plaintiff elected to stop attending physical therapy, notes from those sessions consistently indicated that plaintiff tolerated this treatment well. R. at 1163, 1166-1184. Imaging of plaintiff's spine and vertebrae revealed no more than mild degenerative changes and a scan in March of 2009 indicated that his vertebral body heights and disc spaces were normal. R. at 19, 445, 1235-1236. On a Braden Scale analysis completed at Butler VA on March 16, 2009, plaintiff was assessed with a score of 4/4 in the category of "mobility," meaning that he had "no limitation" in the ability "to make major and frequent change in position without assistance."[15] R. at 19, 595. Finally, despite plaintiff's complaints of physical pain, he stated during a March of 2010 psychiatric follow-up that he was able to move furniture around in his home on a weekly basis in order to clean, including under the bed. R.at 21, 48-49, 1169.

"Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 164 (3d Cir. 2008). The record contains numerous inconsistences with Dr. Baumgartel's account of plaintiff's limitations. Thus, the ALJ's decision to give less weight to those limitations was supported by substantial evidence.

It follows that the ALJ did not err in determining plaintiff's RFC assessment. In formulating an RFC, the ALJ need only include the limitations that have been credibly established. *Id.* at 163. For the reasons discussed above, the ALJ's decision to assign less

---

[15]    Prevention Plus: the Home of the Braden Scale, Braden Scale for Predicting Sore Risk, http://www.bradenscale.com/images/bradenscale.pdf (last visited December 16, 2013).

weight to a portion of Dr. Baumgartel's opinion was supported by substantial evidence. Accordingly, the ALJ did not err in omitting that portion of the limitations from plaintiff's RFC assessment.

Similarly, the ALJ did not err in failing to seek clarification from Dr. Baumgartel regarding his report. The regulations provide that an ALJ must re-contact a medical source "when the report from your medical source contains a conflict or ambiguity that *must* be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.912(e)(1) (emphasis added).[16] The critical inquiry in determining whether the ALJ had an obligation to seek clarification is whether the record as a whole contained enough evidence for the ALJ to reach an informed determination. *Toland v. Colvin*, 2013 WL 6175817 (W.D. Pa. Nov. 25, 2013). *See also Thurman v. Barnhart*, 2007 WL 2728656 (E.D. Pa. Sept. 18 2007) (noting that although the Third Circuit has not expressly addressed the ALJ's duty to re-contact, most cases in this jurisdiction have applied the aforementioned inquiry). In other words,

> when the treating physicians' conclusions are inconsistent with the objective medical evidence in the record, or the limitations on a claimants' ability reported by the treating physicians are not supported by objective medical evidence, the ALJ is permitted to give these conclusions little or no weight. In such a case, an ALJ is not obligated to recontact the treating physician and request an explanation of the inconsistency between the physician's treatment notes and his assessment.

*Ellow v. Astrue*, 2013 WL 159919 (E.D. Pa. Jan. 15, 2013) (internal citations omitted).

The record was sufficiently developed for the ALJ to make an informed disability determination, which he did in a thorough and well-reasoned decision. The ALJ's finding that the limitations assessed by Dr. Baumgartel were inconsistent with the evidence did not obligate

---

[16] The current regulations have eliminated this provision but it continues to apply in cases that were adjudicated before March 26, 2012. *See Gray v. Astrue*, 2012 WL 1521259, * n. 1 (E.D.Pa. May 1, 2012).

him to re-contact the doctor for clarification.

### c. The ALJ's credibility finding

Plaintiff's contention that the ALJ applied an inappropriate legal standard in assessing plaintiff's credibility also is misplaced. Determinations of credibility are within the province of the ALJ and cannot be disturbed on appeal if they are supported by substantial evidence. *Van Horn v. Schweiker*, 717 F.2d 871, 871, 873 (3d Cir. 1983). "When making credibility findings, the ALJ must indicate which evidence he rejects and which he relies upon as the basis for his finding." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 146 (3d Cir. 2007). The ALJ may conclude that a claimant is less than fully credible where there are inconsistencies between the claimant's testimony and daily activities that support such an assessment. *Id.* at 146; *accord Boyce v. Barnhart*, 66 F. App'x 297, 299-300 (3d Cir. 2003) (ALJ could find claimant less than fully credible due to inconsistencies in her accounts of pain and failure to take her prescribed medication).

Contrary to plaintiff's contention, plaintiff's testimony and complaints of pain were not consistent with the record as a whole and the ALJ provided a complete discussion of these inconsistencies. Despite plaintiff's assertion that he suffers from severe back and neck pain, imaging scans evidenced no more than mild degenerative changes. R. at 19, 445, 523. Further, plaintiff consistently stated that physical therapy was making his pain more manageable and notes from those sessions indicated he tolerated the treatment well. R. at 19, 1166-1185. Additionally, on November 16, 2010, plaintiff told a registered nurse at Butler VA that he was satisfied with his pain management. R. at 19, 1286. Plaintiff's testimony that he could not walk for more than five minutes without a break also is inconsistent with his statement that he moves furniture to clean his home as well as with Dr. Newman's observation that he walked a half mile

to attend his evaluation.  R.at 21, 48-49, 53, 464 1169.  Given these inconsistencies, the ALJ's finding that plaintiff was less than fully credible was supported by substantial evidence.  *See Garret*, 274 F.App'x. at 164.

### d.  The vocational expert's testimony

Plaintiff's argument that the ALJ erred in relying on the testimony of the vocational expert because the hypotheticals posited by the ALJ did not include all of his limitations is unavailing.  (Docket Nos. 13 at 13).  Hypotheticals to a vocational expert need not include limitations that are not credibly established.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  For the reasons discussed above, the ALJ's decision to grant less weight to a portion of Dr. Baumgartel's opinion was supported by substantial evidence.  The limitations assessed therein lacked support and were inconsistent with the record.  Accordingly, the ALJ's decision to omit those limitations from the hypothetical was supported by substantial evidence.

## VI.  CONCLUSION

For the foregoing reasons, the ALJ's decision that plaintiff was not disabled was based on substantial evidence.  Accordingly, plaintiff's Motion for Summary Judgment will be denied, defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed.  Appropriate orders will follow.

Date: February 25, 2014

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Jaya Shurtliff, Esquire
        Paul Kovac, AUSA

        (*Via CM/ECF Electronic Mail*)